Clerk's Office
Filed Date: 3/31/2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW
YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MARCO ANTONIO SANCHEZ JUAREZ and
JANET GUTIERREZ,

                Plaintiffs,

    -against-


156-40 GRILL LLC d/b/a Taverna Greek Grill,
EVANGELOS POLLATOS, MARIA KARRAS-
POLLATOS, MICHAEL SIDERAKIS, and
KONSTANTINOS SIKLAS,

                Defendants.
-----------------------------------------------------------x

NOT FOR PUBLICATION
**POST-TRIAL FINDINGS OF**
**FACT AND CONCLUSIONS OF**
**LAW**
15-cv-5081 (CBA) (LGD)

**AMON, United States District Judge:**

Plaintiffs Marco Antonio Sanchez Juarez ("Sanchez") and Janet Gutierrez ("Gutierrez") bring this action against 156-40 Grill LLC (the "Taverna Grill"), Evangelos Pollatos ("Pollatos"), Maria Karras-Pollatos ("Karras-Pollatos"), Michael Siderakis ("Siderakis"), and Konstantinos Siklas ("Siklas") (collectively, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). (ECF Docket Entry ("D.E.") # 1.)

I held a two-day bench trial on May 16 and 17, 2022 to determine each Defendant's liability, if any, under the FLSA and NYLL. The parties submitted post-trial briefing. (D.E. ## 117, 119, 120-21.) After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, I make the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

**FINDINGS OF FACT**[1]

These Findings of Fact are based in large measure upon credibility determinations. I find that Plaintiffs Sanchez and Gutierrez were largely credible as it pertained to the day-to-day

---

[1] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice versa.

operations of the Taverna Grill, their terms of employment, and their rates of compensation, and that Defendants Karras-Pollatos, Siderakis, and Siklas on critical issues were not credible because their testimony frequently contradicted earlier sworn testimony that was either given in depositions in this case or in affidavits and affirmations in other, related cases.

## I. Decision to Open the Taverna Grill and Hiring of Sanchez

1. Karras-Pollatos is married to Pollatos, and she and Pollatos created 156-40 Grill LLC for the purpose of opening a Greek restaurant in Queens, New York. Karras-Pollatos was the only member of the LLC until February 2013. Although the membership was in Karras-Pollatos's name, Pollatos considered the ownership interest to be controlled by both of them. (D.E. ## 117-1, 117-2 ("Tr.") 112:13-18; 125:15-25; 179:3-16.)

2. Siderakis is the owner of the Cross Bay Diner in Queens. He met Pollatos for the first time when Pollatos was a customer at the Cross Bay Diner in the summer of 2012. (Id. at 239:4-240:7.)

3. In or around October 2012, Pollatos approached Siderakis to ask him for help in opening the restaurant that would become the Taverna Grill.[2] Pollatos approached Siderakis because of his experience in the restaurant industry. (Id. at 157:22-25; 303:25-304:3; 341:3-13.)

4. Siderakis and Siklas were partners at the Park View Diner in Brooklyn. (Id. at 303:13-19.)

5. After speaking with Pollatos, Siderakis spoke to Siklas about the proposal and the two decided they would try to go into business with Pollatos. (Id. at 239:17-23.)

6. In October 2012, Pollatos, Siderakis, and Siklas hired Sanchez to cook for the Taverna Grill. Before hiring him, the three took Sanchez to a Brooklyn diner[3] to cook as an audition.

---

[2] Siderakis testified that Pollatos first raised the concept of the Taverna Grill to him in January 2013. (Tr. 239:4-240:9.) However, both Sanchez and Pollatos credibly testified that Siderakis and Siklas were present at Sanchez's cooking audition, which occurred around October 2012 (see infra). (Tr. 17:22-21:25; 159:18-160:12.) Accordingly, I find that Pollatos approached Siderakis initially in or around October 2012 and not January 2013.

[3] Although Sanchez could not remember the name of the diner, referring to it as "Carbide something," (Tr. 18:3), based on Pollatos's credible testimony, it seems likely that the audition was held at the Parkview Diner in

Because the audition was successful, the three then met with Sanchez on another occasion shortly thereafter to discuss salary and menu items. (<u>Id.</u> at 17:11-22:13.)

7.      Pollatos, Siderakis, Siklas, and Sanchez agreed that Sanchez would be paid $1,000 per week when the restaurant opened. The agreement was made orally, and Sanchez never received a document reflecting his salary. The three also discussed Sanchez's schedule with him—six days per week—and the hours he would work. (<u>Id.</u> at 22:14-24:6; 29:1-6.)

8.      Sanchez was never told by anyone at the restaurant that his salary was expected to cover pay at time-and-a-half for hours worked beyond 40 hours in one week. (<u>Id.</u> at 68:24-69:2.)

9.      Sanchez was never told by anyone at the restaurant that his salary would include extra pay for each day that he worked more than ten hours. (<u>Id.</u> at 69:3-6.)

## II.   The Construction Phase

10.     The space that Pollatos leased for the Taverna Grill had been flooded during Hurricane Sandy, and accordingly, needed substantial renovations. (<u>Id.</u> at 240:11-23.)

11.     The renovations included re-tiling the dining room and bathroom, building booths and seating for the dining room, installing new kitchen appliances, and updating the electrical and plumbing of the building. (<u>Id.</u> at 185:10-187:2.)

12.     The construction phase lasted approximately four months, from October 2012 to March 2013. (<u>Id.</u> at 24:12-20.)

13.     Pollatos visited the property every day during the construction phase. (<u>Id.</u> at 160:24-161:1.)

14.     Construction was overseen by a contractor named Tom Liberatos and a construction company called Magnetic Construction. (<u>Id.</u> at 161:2-8.)

---

Brooklyn. (<u>Id.</u> at 159:17-21 (Pollatos testimony that Sanchez's cooking audition was at the Parkview Diner); 254:8-19 (Siderakis testimony that he and Siklas were partners at the Parkview Diner).)

Sanchez testified that he worked during the construction phase on a variety of tasks for 60 hours per week and was supposed to be paid $750 per week.  (Id. at 24:7-26:11.)  Sanchez also testified that, despite this agreement, he was paid only $600 or $650 per week.  (Id. at 25:19-26:16.)  Sanchez elaborated that when he asked Siklas why he had not been paid $750, Siklas told him the restaurant did not have enough money on hand.  (Id. at 26:24-27:3.)

I find that Sanchez has not met his burden to prove his involvement in the construction phase by a preponderance of the evidence.  Although I find Sanchez generally credible, his testimony about this work was suspect.  First, Sanchez's description of the work he performed during that period was vague, and the limited scope of the work he described performing is arguably inconsistent with the many hours per week he testified to spending on the construction.  (See id. at 70:3-71:22.)  Second, other testimony called Sanchez's testimony into doubt.  Pollatos testified credibly (at least on this point) that he was at the property every day during the construction period, and that Sanchez did not work at the restaurant during that time.  (Id. at 160:13-161:1.)  Pollatos further testified that he used a contractor named Tom Liberatos to carry out the restaurant renovations.  On cross-examination, Sanchez stated that he did not know anyone by that name.  (Id. at 78:3-11; 161:2-8.)  Presumably, if Sanchez was working there he would have known the name of the contractor.

### III.    Agreement between Karras-Pollatos, Siderakis, and Siklas

15.    On February 11, 2013, Karras-Pollatos, Siderakis, and Siklas entered into an amended LLC agreement (the "February 2013 Agreement") in which each member would have a one-third ownership interest in the Taverna Grill.  (Id. at 112:19-25; 126:1-7; 239:17-23; 303:20-24; see D.E. # 117-6 (156-40 Grill LLC Amended and Restated Articles of Organization).)

16.     The February 2013 Agreement established that Siderakis and Siklas would be the general manager and assistant manager of the LLC, respectively.  (Tr. 128:15-18; D.E. # 117-6.)

17.     Siklas and Siderakis were tasked with managing the restaurant because Pollatos and Karras-Pollatos had no restaurant experience.  (Tr. 303:25-304:3.)

18.     Siklas understood he and Siderakis's management role to include scheduling day-to-day operations, ordering food, food quality, and food service.  (Id. at 304:2-6.)

19.     Before the restaurant opened but after the February 2013 Agreement was signed, Pollatos, Siderakis, and Siklas contracted with a restaurant supplier, MKM Food Equipment ("MKM"), to purchase equipment.  This equipment included a charcoal grill, a bain marie, refrigerators, a flattop, deep fryers, and a salad station.  (Id. at 254:20-257:23; 291:21-292:3.)

20.     MKM provided Pollatos, Siderakis, and Siklas with $75,000 in credit, split evenly between the three of them.  (Id. at 286:17-287:8.)

21.     In total, Siderakis invested approximately $50,000 into 156-40 Grill LLC.  Of that amount, approximately $25,000 was initially paid to Pollatos and Karras-Pollatos.  Siderakis then paid $23,000 to MKM over a series of payments in order to pay off his one-third stake of the $75,000 in credit.  (Id. at 254:20-256:16; 286:17-287:8.)

22.     Like Siderakis, Siklas made an initial payment of approximately $25,000 to Pollatos and Karras-Pollatos, and he also paid approximately $25,000 to MKM over a series of payments in order to pay off his one-third stake of the $75,000 in credit.[4]  (Id. at 285:12-287:8.)

## IV.     Restaurant Opening and Hiring of Gutierrez

23.     The restaurant opened in March 2013.  (Id. at 28:13-14.)

---

[4] In an affidavit in a related case, Siklas attested that, in total, he invested $69,457 in the Taverna Grill.  (Tr. 329:12-25; D.E. # 117-14 ("Siklas Aff.") ¶ 8.)  At trial, Siklas could not account for any additional investments beyond the approximately $50,000 paid to Pollatos, Karras-Pollatos, and MKM.  (See Tr. 286:11-15.)

24.     During the entire operation of the restaurant, the Taverna Grill opened at 11 a.m.  On slower days, the business would close around 9:30 p.m.  On busier days, it would close as late as 11 p.m.  (Id. at 192:17-19.)

25.     In March 2013, Sanchez spoke about the Taverna Grill with Gutierrez.  Specifically, Sanchez told Gutierrez that the restaurant was looking for employees.  (Id. at 83:8-23.)

26.     After speaking with Sanchez, Gutierrez met with Pollatos to ask if he was hiring.  (Id. at 84:1-16.)

27.     Pollatos hired Gutierrez to work in the kitchen in the salad area.  Gutierrez was hired to work six days per week.  (Id. at 84:23-85:8.)

28.     Pollatos told Gutierrez that she would be paid $600 per week.  Gutierrez never received a document reflecting her salary.  (Id. at 86:5-87:1.)

29.     Like Sanchez, Gutierrez was never told by anyone at the restaurant that her salary was expected to cover pay at time-and-a-half for hours worked beyond 40 hours in one week.  (Id. at 94:15-17.)

30.     Gutierrez believed that Siderakis owned the Taverna Grill.  (Id. at 89:10-90:6.)

31.     Gutierrez was not familiar with Siklas, who was not involved in her hiring.  (Id. at 90:7-8; 103:3-22.)

### V.     Taverna Grill Day-to-Day Operations

32.     When the restaurant first opened, Pollatos was present and working on most days of the week.  Siderakis and Siklas would come to the restaurant less frequently, but usually two or three times per week.  (Id. at 31:2-22.)

33.     Karras-Pollatos was not an active presence at the Taverna Grill; instead, she came to the restaurant only to eat with her children.  Karras-Pollatos's primary role in the restaurant was as an investor.  (Id. at 126:1-24; 142:23-25.)

34.     When he was at the restaurant, Pollatos would give instructions to employees, including, among other things, directing employees to cook specific specials and to clean the restaurant.  Pollatos would also taste the food as it was being cooked.  (Id. at 34:23-36:1.)

35.     When Siderakis and Siklas were in the restaurant, they would also give instructions to employees.  For example, Siderakis would instruct employees on how to cook the food and Siklas would set the menu for the week.  (Id. at 36:9-18.)

36.     Pollatos and occasionally Siklas would post a work schedule for the employees, but the work schedule was not posted every week.  (Id. at 54:10-15.)

37.     Pollatos and Siderakis also supervised employees in the kitchen and ordered supplies for the restaurant.  (Id. at 89:22-90:6.)

38.     Pollatos frequently paid employees, including Sanchez, by giving them an envelope filled with cash and a slip of paper for them to sign to confirm receipt of their wages.  After Sanchez signed the slip of paper, he would give it back and did not receive a copy of the paper he signed to keep for himself.  (Id. at 38:18-39:10; 41:6-17.)

39.     Siderakis ceased coming to the restaurant in September of 2013.  See infra.  Prior to that time, Pollatos would meet Siderakis on Cross Bay Boulevard at a bank parking lot, and Siderakis would provide him with the envelopes of cash and/or checks to pay the employees and the slips of paper to confirm receipt.  (Id. at 198:21-199:11; 344:3-20.)

40.     To support these facts, Plaintiffs introduced as an exhibit a slip of paper dated June 1, 2013 with Sanchez's signature and a note that Sanchez was paid $1,000 in cash for the week ending

June 2, 2013. Siderakis prepared the slip of paper confirming Sanchez's payment for the week and gave it to Pollatos, who had Sanchez sign the slip. Siderakis insisted that Pollatos have Sanchez (or any other employee being paid in cash) sign the slip before being paid, purportedly so that employees could not falsely claim they were not being paid their wages. (Id. at 338:23-339:20; D.E. # 117-10 ("Receipt of Payment").)

41.     On occasion, Sanchez was also paid by Siklas. On those occasions, Siklas too would require Sanchez to sign a slip of paper before being paid. (Tr. 41:18-42:11.)

42.     For the first four months after the restaurant opened, Sanchez worked seven days per week. (Id. at 29:7-17.)

43.     During those four months, there were three weeks in which Sanchez was not paid at all. At no time thereafter did anyone from the Taverna Grill pay Sanchez for those weeks. (Id. at 36:23-37:24.)

44.     Roughly two out of every three weeks, Sanchez was paid a weekly salary of $800, rather than his agreed-upon weekly salary of $1,000. (Id. at 36:19-38:17.)

45.     After four months of working seven days per week, Sanchez spoke with Siderakis, Siklas, and Pollatos and requested to reduce his workload from seven days to six days per week. Pollatos eventually granted that request. (Id. at 29:25-31:7.)

46.     To the extent Sanchez was able to take a break during the workday, which was rare, he was not permitted to leave the premises of the Taverna Grill. (Id. at 69:7-9; 192:23-193:2.)

47.     For the duration of Gutierrez's employment, she worked six days per week. (Id. at 85:6-15.)

48.     Although Gutierrez had been promised $600 per week, she was not always paid that amount, and in April 2013 she was sometimes paid $450 per week. When Gutierrez was paid less

than $600, it was not because she had worked fewer hours that week. (Id. at 86:5-9; 88:18-89:5; 97:21-98:3.)

49.     Gutierrez was paid by Pollatos. She was sometimes paid in cash and sometimes by check. When she was paid by check, the check was signed by Pollatos. (Id. at 89:6-7; 208:10-21.)

50.     Gutierrez was never asked to sign a slip of paper confirming receipt of her pay. (Id. at 94:18-22.)

51.     Gutierrez did not take breaks during the workday and was not permitted to leave the premises during the workday. (Id. at 88:3-4; 192:23-193:2.)

## VI.     Employee Walkout and Hiring of Karanasos

52.     In April 2013,[5] the Taverna Grill closed due to a walkout by the staff that was prompted by the restaurant's failure to pay its employees. The restaurant was closed for two weeks. (Id. at 81:2-7.)

53.     During the staff walkout, Pollatos and Siklas had a disagreement over staffing. Pollatos wanted to bring back the crew that walked out, while Siklas preferred to take a month or two, find new staffing, and then reopen the restaurant. (Id. at 315:15-317:14.)

54.     Siderakis also objected to Pollatos wanting to reopen the restaurant after two weeks. Specifically, Siderakis advised that the restaurant was not ready to reopen and that they should find the "right crew" before reopening. (Id. at 301:18-302:3.)

55.     At the time of the walkout, Siderakis, Pollatos, and Siklas had authority as a group to hire new employees. (Id. at 316:13-16.)

---

[5] Sanchez could not remember when the employee walkout occurred, (Tr. 80:18-81:1), while Siderakis testified that the walkout occurred at some point in April, (id. at 246:3-9). In addition, Plaintiffs' counsel referred Siderakis to a document in which he had attested that the restaurant was temporarily closed on April 12, 2013 in order to recruit new staff. (Id. at 298:5-17.)

56.     Pollatos and Siderakis were involved in calling employees and asking that they come back to work at the Taverna Grill after the walkout.  Specifically, Pollatos and Siderakis called Sanchez to encourage him to return to the restaurant.  Sanchez did so.  (Id. at 81:11-12.)

57.     At some time in April 2013, Pollatos hired his sister, Rosa Karanasos ("Karanasos"), to work at the register of the Taverna Grill.  (Id. at 225:20-226:6; 228:14-22.)

58.     Pollatos told Karanasos she would be paid $500 or $600 a week, depending on the number of days per week she worked.  (Id. at 228:23-229:12.)

59.     Karanasos was paid by Pollatos or Siderakis.  (Id. at 229:23-24.)

**VII.     Treatment of Non-Plaintiff Employees and End of Gutierrez's Employment**

60.     At some point during the restaurant's operation, Pollatos was approached by Sanchez, who spoke to him regarding the low salary of a dishwasher named Ana Maria.  (Id. at 47:20-50:5.)

61.     Sanchez told Pollatos that Ana Maria's salary was too low and that no employee could survive on $200 per week.  Pollatos responded that he could find other employees from the Cross Bay Diner, owned by Siderakis, that could replace Ana Maria.  (Id. at 50:13-23; 239:4-240:7.)

62.     At some point during the restaurant's operation, dishwashers from the Cross Bay Diner were brought in to replace dishwashers who left the Taverna Grill.  The dishwashers were sent by Siderakis.  (Id. at 205:15-206:5.)

63.     Sanchez worked with another cook named Edgar.  (Id. at 59:4-5.)

64.     Siklas observed Edgar taking a soda from a refrigerator next to the kitchen and told Edgar that the sodas were for customers only.  Siklas then terminated Edgar.  (Id. at 59:8-18.)

65.     Gutierrez worked at the Taverna Grill until approximately June 2013.  (Id. at 88:5-8.)

66.     For three weeks in June 2013, Gutierrez was not paid her salary.  She left the Taverna Grill that month because she was not being paid.  (Id. at 88:5-10; 94:5-12.)

67.    Throughout Gutierrez's employment, the Taverna Grill did not have a time clock, sign-in sheet, or any other means of recording arrival and departure times.  During the duration of her employment, the Taverna Grill also never posted wage notices.  (Id. at 87:22-24; 94:23-25.)

68.    Around June 2013, a cook named Valencia was hired.  (Id. at 51:17-52:13.)

69.    At some point during Sanchez's employment, Pollatos terminated Valencia because his pay was too high.  (Id. at 52:14-54:9.)

**VIII.    Partnership Break Down Between Pollatos, Siderakis, and Siklas**

70.    In September 2013, the partnership between Pollatos, Siderakis, and Siklas broke up. Siderakis and Siklas walked away from the restaurant, and Pollatos took sole responsibility for the day-to-day operations of the restaurant.  (Id. at 196:25-197:8; 163:3-25.)

Siderakis and Siklas insist that they left the restaurant in mid-April 2013—only ten days after the restaurant opened—after a series of management disputes with Pollatos and Karras-Pollatos.  (See, e.g., id. at 293:20-24.)  I find this timeline to be incredible.  Siderakis testified that he and Siklas invested roughly $50,000 apiece into the Taverna Grill, between payments to Pollatos and Karras-Pollatos and payments to MKM.  (See id. at 254:20-256:16.)  This accounting is confirmed by the evidentiary record; both Siklas and Siderakis testified in a related lawsuit that they "spent $116,201 on the restaurant since its inception."  (See Siklas Aff. ¶ 25; D.E. # 117-3 ("Siderakis Aff.") ¶ 25.)  In addition, both Sanchez and Pollatos credibly testified that Siderakis and Siklas remained involved with the Taverna Grill seven to eight months after the restaurant opened.  (Tr. 59:19-60:3; 79:6-13; 196:25-197:8.)  Pollatos also produced evidence and testimony that Siderakis gave him payslips for employees to sign, including the one Sanchez signed that was dated June 1, 2013.  (Id. at 38:12-41:12; 338:23-339:20; see Receipt of Payment.)  Gutierrez's testimony further contradicts Siderakis's contention that he left the restaurant after only ten days

because she testified that he stopped coming into the restaurant in May 2013.[6]  (Tr. 95:1-7.)  In sum, because I find it unlikely that Siderakis and Siklas abandoned such a large personal investment after only ten days, and because Sanchez and Pollatos offer credible testimony to the contrary, I find Siderakis's and Siklas's timeline to be incredible.  Accordingly, I find by a preponderance of the evidence that Siderakis and Siklas remained involved in the Taverna Grill until September 2013—roughly seven months after the restaurant opened.

71.     After Siklas and Siderakis left the restaurant, Pollatos was responsible for the payroll of the restaurant, employee scheduling, and keeping time records.  (Id. at 218:4-14.)

72.     During the last few months of Sanchez's employment, Pollatos was the only person who paid Sanchez.  (Id. at 64:24-65:3.)

73.     Siderakis and Siklas continued to make weekly payments to MKM—based on charges incurred before opening—even after they left the Taverna Grill.  (Id. at 286:17-287:8.)

## IX.     Sanchez's Termination and Taverna Grill Closure

74.     The restaurant closed permanently on January 21, 2014.  (Id. at 174:9-23.)

75.     Sanchez worked at the restaurant from its opening day until he was fired around January 2014.[7]  (Id. at 28:13-25.)

76.     Sanchez was terminated by Pollatos.  (Id. at 55:5-57:10; 204:6-13.)

---

[6] Although Gutierrez's testimony on how long Siderakis was involved described an earlier end date than Sanchez and Pollatos's account of seven to eight months, Gutierrez also left the Taverna Grill in June 2013.  (Tr. 88:5-8.)  Thus, her personal knowledge with respect to Siderakis's presence at the restaurant after she left is less reliable than testimony from Sanchez and Pollatos describing Siderakis's continued involvement.

[7] Sanchez agreed on direct examination that it would "be fair to say that" he "left in around March of 2014." (Tr. 28:23-25.)  I find that this timeline is inconsistent with the evidentiary and testimonial record, which reflects that the restaurant closed in January 2014.  (See, e.g., id. at 174:9-11; Siderakis Aff. ¶ 18 ("I recently learned from the landlord of the premises that on January 28, 2014, the plaintiff, Mrs. Karas-Pollatos, sold the business and the assets of 156-40 Grill, LLC.  I learned that plaintiff and her husband surrendered possession of the premises and had the lease, then in effect, declared in default.").)

77. On the day he was terminated, Sanchez spoke with Pollatos to receive his pay for the week. Pollatos gave Sanchez his weekly pay and then told him that he was fired. Sanchez was told that he was being terminated because he had tried to hurt a waiter named Michael Klouvas with a knife. (Id. at 55:5-59:2; 201:11-202:25.)

78. Throughout Sanchez's employment, the Taverna Grill did not have a time clock, sign in sheet, or any other means of recording arrival and departure times. During the duration of his employment, the Taverna Grill also never posted wage notices. (Id. at 68:2-8.)

## CONCLUSIONS OF LAW

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The "'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings." Hassoun v. Searls, 968 F.3d 190, 202 (2d Cir. 2020) (quoting Sea Island Broad Corp. of S.C. v. FCC, 627 F.2d 240, 243 (D.C. Cir. 1980)).

Plaintiffs claim that they are entitled to unpaid minimum wages and unpaid overtime wages under the FLSA and NYLL, spread of hours pay under the NYLL, and statutory damages under the NYLL for Defendants' failure to provide time of hire notices and wage statements. Each Defendant's sole defense at trial was that they were not "employers" under the FLSA or NYLL. (D.E. # 87 § IV.) Pollatos and Karras-Pollatos claim that Siklas and Siderakis were Plaintiffs' employers, and vice versa. For the reasons set forth below, I find that Plaintiffs have proved by a preponderance of the evidence that Pollatos, Siderakis, and Siklas were all "employers" for purposes of the FLSA and NYLL, but Karras-Pollatos was not.

## I. Employers under the FLSA and NYLL

"To be held liable under the FLSA, a person must be an 'employer,' which § 3(d) of the statute defines broadly as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting 29 U.S.C. § 203(d)). It is undisputed that 156-40 Grill LLC, the corporate defendant charged with operating the Taverna Grill, employed Plaintiffs.[8] The primary issue of dispute in this case is therefore whether any combination of the individual defendants—Pollatos, Karras-Pollatos, Siderakis, and Siklas—were "employers" under the FLSA and NYLL.

As a threshold matter, "[f]ederal regulations and Circuit precedent 'recognize the possibility of joint employment for purposes of determining FLSA responsibilities'" and accordingly, a finding that Pollatos and Karras-Pollatos were employers would not preclude a finding that Siklas and Siderakis were also employers. See Teri v. Spinelli, 980 F. Supp. 2d 366, 375 (E.D.N.Y. 2013) (quoting Barfield v. N.Y.C. Health and Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008)).

The Supreme Court has recognized "that broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." Irizarry v. Catsimatidis, 722 F.3d 99, 103 (2d Cir. 2013) (quoting Tony & Susan Alamo Found. v. Sec'y of Lab., 471 U.S. 290, 296 (1985)). "Accordingly, the Court has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction," including with respect to the breadth of

---

[8] Plaintiffs have not moved for default against 156-40 Grill LLC. Plaintiffs accurately note, however, that "156-40 Grill LLC has not appeared in this matter through an attorney, and is not defending itself," and that a failure by a corporate entity to retain counsel and appear can be grounds for default. (D.E. # 117 ("Pl. Tr. Br.") 25); see Batson v. RIM San Antonio Acquisition, LLC, No. 15-cv-7576 (ALC) (OTW), 2022 WL 769706, at *3 (S.D.N.Y. Feb. 18, 2022), report and recommendation adopted, 2022 WL 767071 (Mar. 14, 2022).

the employee-employer relationship.  Id. (quoting Tony, 471 U.S. at 296).  Indeed, "[t]he common

law agency test was found too restrictive to encompass the broader definition of the employment

relationship contained in the [FLSA]."  Frankel v. Bally, Inc., 987 F.2d 86, 89 (2d Cir. 1993).

However, "[t]he statute nowhere defines 'employer' in the first instance."  Irizarry, 722 F.3d at

103.  Instead, the word "employ" is defined expansively to mean "suffer or permit to work," 29

U.S.C. § 203(g), and the definition of "employer" defines the word only in relation to an

"employee": "any person acting directly or indirectly in the interest of an employer in relation to

an employee," id. § 203(d).  As a result, "the Second Circuit 'has treated employment for FLSA

purposes as a flexible concept to be determined on a case-by-case basis by review of the totality

of the circumstances.'"  Id. (citation omitted).  The underlying inquiry focuses on "whether the

individual possessed operational control over employees . . . .  A person exercises operational

control over employees if his or her role within the company, and the decisions it entails, directly

affect the nature or conditions of the employees' employment."  Tapia v. BLCH 3rd Ave LLC,

906 F.3d 58, 61 (2d Cir. 2018) (per curiam) (internal quotation marks and citation omitted).

To guide the inquiry of whether a defendant is a FLSA employer, the Second Circuit has

established a set of non-dispositive factors (the "Carter factors").  These factors include: "whether

the alleged employer (1) had the power to hire and fire the employees, (2) supervised and

controlled employee work schedules or conditions of employment, (3) determined the rate and

method of payment, and (4) maintained employment records."  Carter v. Dutchess Cmty. Coll.,

735 F.2d 8, 12 (2d Cir. 1984) (quoting Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465,

1470 (9th Cir. 1983)).  Although these factors are instructive, "[n]one of the factors used . . .

comprise a rigid rule for the identification of an FLSA employer"; instead, they "provide a

nonexclusive and overlapping set of factors" to capture the economic realities of the workplace

and to "give proper effect to the broad language of the FLSA." <u>Irizarry</u>, 722 F.3d at 105 (internal quotation marks omitted) (quoting <u>Barfield</u>, 537 F.3d at 143).

Because the NYLL and FLSA definitions of "employer" are nearly identical, "[d]istrict courts in this Circuit have interpreted the definition of employer under the New York Labor Law coextensively with the definition used by the FLSA." <u>Teri</u>, 980 F. Supp. 2d at 373 (quotation marks omitted) (quoting <u>Sethi v. Narod</u>, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013)). While "the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's . . . there is no case law to the contrary." <u>Fermin v. Las Delicias Peruanas Rest., Inc.</u>, 93 F. Supp. 3d 19, 37 (E.D.N.Y. 2015) (citation omitted). Accordingly, because I see no reason to depart from the practice of other courts in this Circuit, my analysis of "employer" under the FLSA applies with equal force to Plaintiffs' NYLL claims.

### A. Application as to Evangelos Pollatos

Applying this flexible test here, I find that Pollatos was an "employer" with respect to both Sanchez and Gutierrez. The first <u>Carter</u> factor asks whether the employer "had the power to hire and fire the employees." 735 F.2d at 12. The record reflects that Pollatos had this authority throughout the Taverna Grill's operation. Sanchez and Gutierrez both credibly testified that Pollatos was involved in hiring them. (<u>See</u> Finding of Fact ("FOF") 6, 27; Tr. 17:22-22:13, 84:1-86:14.) Specifically, Pollatos was involved, along with Siderakis and Siklas, in "auditioning" Sanchez, as well as setting his initial salary and hours. (FOF 6-7; Tr. 17:22-23:14.) Pollatos also set Gutierrez's initial salary and hours. (FOF 27-28; Tr. 84:1-86:14.) Pollatos's sister, Karanasos, testified that Pollatos hired her to work at the Taverna Grill and that Pollatos set her weekly salary at $500 to $600. (FOF 57-58; Tr. 228:14-229:12.) Sanchez also testified that after the staff walkout, Pollatos and Siderakis called him and asked him to return to work. (FOF 56; Tr. 81:11-

12.)  I further heard credible testimony that Pollatos was involved in firing employees.  Sanchez testified that he observed Pollatos terminating an employee named Valencia at some point during Sanchez's employment.  (FOF 69; Tr. 51:17-54:9.)  In addition, Pollatos admitted during cross-examination that he was the one who terminated Sanchez.  (FOF 76; Tr. 204:6-13.)

The second <u>Carter</u> factor asks if the employer "supervised and controlled employee work schedules or conditions of employment."  735 F.2d at 12.  The record reflects that this factor is satisfied as to Pollatos.  Sanchez credibly testified that, during the first few months of the restaurant's operation, Pollatos and Siklas would (albeit irregularly) post work schedules for the employees on Monday mornings.  (FOF 36; Tr. 54:10-15.)  Sanchez also credibly testified that Pollatos would instruct employees during the workday, including by, among other things, directing employees to cook certain specials and to clean the restaurant.  (FOF 34; Tr. 34:23-36:1.)  Gutierrez testified that Pollatos and Siderakis would supervise employees in the kitchen and order supplies for the restaurant.  (FOF 37; Tr. 89:22-90:6.)  Sanchez also testified that, after four months of working seven days per week, he spoke with Pollatos, Siderakis, and Siklas about reducing his workload, and Pollatos was the one to grant that request.  (FOF 45; Tr. 29:25-31:4.)  Finally, Pollatos admitted that after his partnership with Siklas and Siderakis broke down, he had sole responsibility over the day-to-day operations of the restaurant.  (FOF 70; Tr. 196:25-197:8, 163:3-25.)  These responsibilities included employee payroll, scheduling, and keeping time records.  (FOF 71; Tr. 218:4-14.)

The third <u>Carter</u> factor asks whether the employer "determined the rate and method of payment."  735 F.2d at 12.  Here, too, there is record evidence that Pollatos was involved in determining employees' rates of pay and methods of payment.  As noted above, I heard testimony that Pollatos was involved in setting the salaries for Sanchez, Gutierrez, and Karanasos.  Moreover,

Sanchez credibly testified that he approached Pollatos regarding the salary of a dishwasher named Ana Maria. (FOF 60; Tr. 47:20-50:5.) Sanchez objected that Ana Maria's salary was too low, and Pollatos responded that he could find other employees from the Cross Bay Diner. (FOF 61-62; Tr. 50:13-23, 239:4-240:7.) Sanchez also testified that Pollatos fired Valencia after telling Valencia that he was paying him too much money. (FOF 69; Tr. 52:15-16.) In addition, Sanchez and Gutierrez both testified that they regularly received their pay from Pollatos. (FOF 38, 49; Tr. 41:6-12, 89:6-7.) Pollatos testified that sometimes Gutierrez was paid in cash, and other times she was paid by check, and that when Gutierrez was paid by check, Pollatos would sign the check. (FOF 49; Tr. 208:3-23.) And as discussed above, when Pollatos admitted that the day-to-day operations of the restaurant became his sole responsibility, part of that responsibility included authority over the restaurant's payroll. (FOF 71; Tr. 218:1-14.)

The fourth <u>Carter</u> factor concerns whether the employer "maintained employment records." 735 F.2d at 12. To the extent employment records exist in this case—and there is a general paucity of written records—they are comprised of the payslips that employees signed upon receipt of envelopes with their weekly paychecks (although the parties have produced just one of those payslips). Pollatos credibly testified that Siderakis was responsible for creating the payslips and that Pollatos instructed employees to sign them. (FOF 38-40; Tr. 38:12-41:12, 338:23-339:20; <u>see</u> Receipt of Payment.) The fourth factor then, at least while Siklas and Siderakis were still involved, weighs less heavily in favor of "employer" status for Pollatos, as his involvement with the paperwork was secondary. However, because three <u>Carter</u> factors weigh heavily in favor of finding that Pollatos was Plaintiffs' employer, I hold that he is liable under the FLSA and NYLL. <u>See</u> <u>Fermin</u>, 93 F. Supp. 3d at 36 (finding that the individual defendants were plaintiffs' employers and noting that "the fact that Individual Defendants did not keep employment records does not

undermine this finding because no employment records were kept; thus, the economic reality is that all employer tasks . . . were handled by the Individual Defendants").

### B. Application as to Maria Karras-Pollatos

As I noted in the Findings of Fact, Karras-Pollatos was an infrequent visitor to the Taverna Grill and appears to have visited only with her children. (FOF 33; Tr. 126:8-24.) Although I did not find Karras-Pollatos's testimony to be generally credible, there was a dearth of other testimony suggesting that Karras-Pollatos had "operational control" over Plaintiffs or other employees when she was in the workplace. See Irizarry, 722 F.3d at 107. At best, Plaintiffs' testimony, if accepted, amounts to allegations that Karras-Pollatos occasionally ran the front counter and paid out tips to servers. (See, e.g., Tr. 43:24-44:18.) Even this testimony, however, was undercut by Gutierrez's testimony that Karras-Pollatos "wouldn't show up to the restaurant too much" and testimony concerning Karanasos, who more frequently worked as a hostess. (Id. at 92:3-4, 225:20-24; see also FOF 57.)

Although the Second Circuit has stressed that continuous or absolute control is not required for FLSA liability, Irizarry, 722 F.3d at 110, Karras-Pollatos's isolated instances of work at the Taverna Grill do not satisfy the four Carter factors. Plaintiffs have not identified any evidence that Karras-Pollatos hired or fired any employees or that she maintained employment records. Instead, Plaintiffs argue that Karras-Pollatos's affidavits, filed in a related case, paint a different picture. (Pl. Trial Br. 26-27.) Specifically, in her complaint in that case, she alleged that she was "forced to expend her own time at her own expense to manage the [Taverna Grill]," (D.E. # 117-12 ¶ 16), and in an affidavit, attested that she "made extensive improvements" to the premises, (D.E. # 117-13 ¶ 3). In the same lawsuit, Karras-Pollatos attested that after the staff walkout, she "obtained new staff through help-wanted ads and friends in the business" and "obtained loans from friends

and family to reopen the business." (Id. ¶¶ 11-12.) These general statements, however, do not sufficiently rebut the testimony of Sanchez and Gutierrez, both of whom testified that they had never seen Karras-Pollatos hire or fire anyone, and that at most, she paid out tips to busboys and servers on a sporadic basis. (See, e.g., Tr. 43:13-44:13, 91:18-93:6). Indeed, I asked Gutierrez:

> THE COURT: What responsibility did you observe that [Karras-Pollatos] took on?
>
> THE WITNESS: She would give money to the waiters, the busboys.
>
> THE COURT: Like tips?
>
> THE WITNESS: Yes.
>
> THE COURT: Anything else?
>
> THE WITNESS: No. No.

(Id. at 92:24-93:6.) Although the affidavits and court documents submitted by Plaintiffs reinforce my finding that Karras-Pollatos's testimony was uniquely incredible, they do not establish by a preponderance of the evidence that she was an "employer" for purposes of the FLSA or NYLL.

Finally, Plaintiffs posit that pursuant to the "operating agreement, articles of organization, and contract and transfer agreement of February 11, 2013," Karras-Pollatos "delegated to Mr. Siderakis and Mr. Siklas the authority to hire and fire employees." (Pl. Trial Br. 26.) Those documents established that each of Karras-Pollatos, Siderakis, and Siklas had a one-third interest in the Taverna Grill. Plaintiffs argue that because Karras-Pollatos was able to delegate the power to hire and fire to others, she must have had that authority in the first place. (Id. at 27.) But as the Second Circuit has held, a defendant's status as an investor, even a significant one, is insufficient on its own to show that the defendant possessed the requisite operational control over employees. For example, in Tapia v. BLCH 3rd Ave LLC, the Second Circuit rejected the argument that "[the defendant's] status as a significant shareholder" was sufficient to show that the defendant

"exercised or possessed financial control over BLCH." 906 F.3d at 62; see also Gray v. Powers, 673 F.3d 352, 355-56 (5th Cir. 2012) (rejecting proposition that "merely being an officer or shareholder subjects an individual to FLSA liability."). In Tapia, the Court of Appeals distinguished the defendant from the defendant in a case cited by Plaintiffs, Irizarry v. Catsimatidis, noting that, in Irizarry, the "defendant exercised financial control by keeping track of payroll, arranging a meeting with an outside payroll company, and staying informed about whether employees were paid on time." Tapia, 906 F.3d at 62 (citing Irizarry, 722 F.3d at 115). Because Karras-Pollatos's role is more like the defendant in Tapia than the defendant in Irizarry, I find that, on balance, the Carter factors do not weigh in favor of Karras-Pollatos's status as an employer under the FLSA and NYLL.

### C. Application as to Michael Siderakis

As discussed in my Findings of Fact, I determined that Siderakis and Siklas continued to work with the Taverna Grill until September 2013. (FOF 70.) Although the testimony I heard suggests that Siderakis was less frequently at the Taverna Grill on a day-to-day basis than was Pollatos, there is ample testimonial and record evidence that Siderakis was an employer under the Carter factors. The Second Circuit has made clear that "[employer] status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." Irizarry, 722 F.3d at 110 (quoting RSR, 172 F.3d at 139). Rather, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence." Id. (quoting RSR, 172 F.3d at 139). Unlike with respect to Karras-Pollatos, Plaintiffs have provided sufficient evidence of operational control by Siderakis.

Under the first <u>Carter</u> factor, I heard credible evidence that Siderakis "had the power to hire and fire the employees." 735 F.2d at 12. Sanchez testified that Siderakis, alongside Pollatos and Siklas, was present for his "audition" and that he was hired at the Taverna Grill following that audition. (FOF 6; Tr. 17:22-21:25.) Then, after that meeting, Siderakis, Pollatos, and Siklas negotiated Sanchez's salary. (FOF 6-7; Tr. 22:2-21.) Sanchez also testified that when he spoke to Pollatos about the dishwasher Ana Maria's low wages, Pollatos responded that there were employees at the Cross Bay Diner, which was run by Siderakis, who could replace her. (FOF 60-61; Tr. 47:2-51:3.) Pollatos then testified that he recalled "some dishwashers coming from the [Cross Bay] diner and working at the Greek Grill" and that "[i]f any employees came from the Cross Bay Diner they were sent by Michael Siderakis." (FOF 62; Tr. 205:18-206:5.) That Siderakis was able to replace employees at the Taverna Grill with other employees from the Cross Bay Diner implies that he retained the power to hire employees even after Sanchez was hired.

Plaintiffs also produced evidence that Siderakis "supervised and controlled employee work schedules or conditions of employment." <u>Carter</u>, 735 F.2d at 12. Sanchez credibly testified that four months into his employment, he was still working seven days per week and approached Siderakis, Siklas, and Pollatos to ask to reduce his workload to six days per week. (FOF 45; Tr. 29:10-31:4.) Although it was Pollatos who eventually granted that request, the fact that Sanchez approached the "three associates" to have his workload reduced indicates that Siderakis had some level of control over Sanchez's schedule. (<u>Id.</u>) Sanchez testified that after the staff walkout, Pollatos and Siderakis called him and asked him to return to work. (FOF 56; Tr. 81:11-12.) Sanchez also testified that, when Siderakis and Siklas were in the restaurant, they would set the menu for the week. (FOF 35; Tr. 36:9-18.) On a more general level, Gutierrez testified that she believed Siderakis to be the owner of the Taverna Grill, and when he came into the restaurant he

would "look in the kitchen, see what's missing, what they needed. [He and Pollatos] were in charge of the restaurant." (FOF 30, 37; Tr. 89:17-24.)

Plaintiffs produced the most robust evidence and testimony, however, in support of the third and fourth Carter factors, that Siderakis "determined the rate and method of payment," and "maintained employment records." 735 F.2d at 12. I received ample credible testimony that Siderakis was in charge of how wages were paid at the Taverna Grill. Although Pollatos usually distributed the cash or checks to employees, Siderakis was responsible for drafting checks and withdrawing cash in order to pay them. Specifically, Pollatos testified that he paid employees "[u]nder the direction of Mike Siderakis" and that Siderakis would give him envelopes, which "contained cash and some checks" for Pollatos to pay the employees. (FOF 39; Tr. 198:21-199:6.) Pollatos later testified, with specific details, that he would meet "Michael Siderakis on Cross Bay Boulevard at the CapitalOne next door in the parking lot and he would give me a yellow envelope with everybody's envelope in there and their names and specifically one or two [payslips] that he needed signed before I gave the payment." (FOF 39; Tr. 344:3-10.) Similarly, Pollatos credibly testified that the only evidence of an "employment record" in this case, a payslip from June 1, 2013, was created by Siderakis, and that Siderakis maintained and kept these payslips. (FOF 40; Tr. 338:17-339:20.) Pollatos testified that Siderakis was "very persistent that no one is to get a salary or [their] pay without signing [a payslip]." (FOF 40; Tr. 339:6-7.) When Pollatos asked Siderakis why signing the payslip is so important, Siderakis responded: "so the staff can't come back when you pay them in cash and say I wasn't paid and, you know, bring an action against us like this." (FOF 40; Tr. 339:2-17.) Accordingly, because Siderakis determined how employees were paid and maintained the only paperwork in this case that could be called "employment records," I find that the third and fourth Carter factors weigh heavily in favor of Siderakis as an

employer. As a result, I find that the <u>Carter</u> factors support Siderakis's status as an employer subject to liability under the FLSA and NYLL.

### D. Application as to Konstantinos Siklas

Siklas lacks the robust testimonial evidence or paper trail Plaintiffs produced for Siderakis. Indeed, Gutierrez acknowledged that she was not familiar with Siklas and that he was not involved in her hiring. (FOF 31; Tr. 90:7-8; 103:3-22.) However, as noted above, the Second Circuit has emphasized that operational control sufficient to give rise to employer status "may be restricted, or exercised only occasionally," <u>Irizarry</u>, 722 F.3d at 110, and I ultimately find that Plaintiffs have provided sufficient evidence that Siklas was an employer for FLSA and NYLL purposes.

Siklas satisfies the first <u>Carter</u> factor because I heard credible testimony that he had the power to hire and fire employees. 735 F.2d at 12. Sanchez credibly testified that he was auditioned by Pollatos, Siklas, and Siderakis, and that he negotiated his salary with all three. (FOF 6-7; Tr. 17:22-21:25.) Sanchez then testified, and Pollatos corroborated, that Siklas fired a cook named Edgar for taking a soda from the kitchen refrigerator. (FOF 64; Tr. 59:8-18.) Moreover, Siklas agreed that, at the time of the staff walkout, he, Pollatos, and Siderakis, "[a]s a group," had the power to hire employees. (FOF 55; Tr. 316:11-14.)

Siklas also satisfies the second <u>Carter</u> factor because Plaintiffs provided evidence that he "supervised and controlled employee work schedules or conditions of employment." 735 F.2d at 12. Sanchez credibly testified that, at least in the beginning, Siklas and Pollatos would post work schedules for the employees. (FOF 36; Tr. 54:10-15.) He also testified that Siklas would instruct cooks on what food to make that week. (FOF 35; Tr. 36:9-18.) Sanchez testified that when he sought to reduce his weekly workload from seven days to six days, he "talked first to [Siderakis], [t]hen [Pollatos], then [Siklas]" and that Pollatos ultimately granted his request. (FOF 45; Tr.

30:6-7.)  Siklas's own testimony supports a finding that this factor is satisfied because he testified that during the staff walkout, he and Pollatos had a disagreement over staffing—specifically, over the time frame of reopening the restaurant—which implies that Siklas had control over employees and their schedules.  (FOF 53; Tr. 316:15-317:10.)

The third and fourth <u>Carter</u> factors do not weigh in favor of employer status.  Plaintiffs elicited some testimony from Sanchez and Pollatos that Siklas was responsible for paying employees during the construction phase, but because I found that Sanchez had not met his burden of showing his involvement in the construction phase, that evidence is of limited value.  (FOF 14; <u>see, e.g.</u>, Tr. 26:20-27:3.)  There is also a near-total absence of employment records in this case, save the payslip that was attributed to Siderakis, which mitigates the importance of the fourth <u>Carter</u> factor.

The Second Circuit has emphasized that the <u>Carter</u> factors do not "comprise a 'rigid rule for the identification of an FLSA employer'" and instead, that they "provide 'a nonexclusive and overlapping set of factors'" to capture the economic realities of the workplace and to "give proper effect to the broad language of the FLSA."  <u>Irizarry</u>, 722 F.3d at 105.  Because I find that Siklas had the authority to hire and fire and exercised control over employee schedules and duties, I find that he had sufficient "operational control" over Taverna Grill employees to be held liable under the FLSA and NYLL.

\* \* \*

In sum, I find that Pollatos was an "employer" for FLSA and NYLL purposes throughout the restaurant's operations, from March 2013 through January 2014.  I find that Karras-Pollatos was not an employer under the FLSA or NYLL.  I find that Siderakis and Siklas were employers from the opening of the restaurant in March 2013 through September 2013.  Because I find that

Pollatos, Siderakis, and Siklas were joint employers from March 2013 through September 2013, I also find that they are jointly and severally liable for any damages incurred by Plaintiffs during that timeframe.  See Fermin, 93 F. Supp. 3d at 37 ("As the Court has found that Las Delicias and the Individual Defendants were jointly Plaintiffs' employers, each Defendant is jointly and severally liable under the FLSA and the NYLL for any damages award made in Plaintiffs' favor.").

## II.    Damages

Each Defendant's sole pretrial defense was that they were not "employers" under the FLSA or NYLL.  In view of my finding that Pollatos, Siderakis, and Sikas were joint employers, Defendants cannot meaningfully dispute that damages were suffered in this case.  Indeed, in their post-trial briefing, Pollatos and Karras-Pollatos submitted a list of "concessions" in the interest "of creating a realistic counter statement of damages that the Court might find fair."  (D.E. # 120 at 1.)  In light of these concessions, I reserve findings of fact or conclusions of law regarding the damages caused in this case at this time.  Accordingly, I direct the parties to schedule a settlement conference before the Honorable Lee G. Dunst, United States Magistrate Judge, in which the Court hopes the parties can reach an agreement on a fair measure of the damages borne by Plaintiffs. Should that settlement hearing prove unsuccessful, I will make separate findings of fact and conclusions of law related to damages.

## CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, I conclude that Plaintiffs have proven by a preponderance of the evidence that Pollatos, Siderakis, and Siklas were "employers" for purposes of the FLSA and NYLL. The parties are hereby directed to schedule a settlement conference before Magistrate Judge Dunst on the question of damages.

SO ORDERED.

Dated: March 31, 2023
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge